UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

IN RE:      RAMREDDY, INC.          :     Chapter 11
                                    :
            Debtor(s)               :
                                    :     Bky. No. 09-15283 ELF

# M E M O R A N D U M

## I. INTRODUCTION

Ramreddy, Inc. ("the Debtor") is a closely held corporation. In February 2008, it entered into a franchise agreement, station lease and other ancillary agreements with Getty Petroleum Marketing, Inc. ("Getty") to operate a LUKOIL gas station in Kulpsville, Pennsylvania. The Debtor began operating the gas station in July 2008. In late March 2009, the Debtor ceased purchasing and selling motor fuel at the station. On April 8, 2009, Getty gave the Debtor written notice of the termination of the franchise and other agreements, effective April 16, 2009.

The Debtor sought relief under chapter 11 of the Bankruptcy Code on July 20, 2009. On August 28, 2009, Getty filed a Motion to Dismiss Case or for Relief from the Automatic Stay ("the Motion").

In the Motion, Getty asserts that the case should be dismissed for "cause" under 11 U.S.C. §1112(b)(1).[1] Getty's primary argument is that "cause," as defined by §1112(b)(4)(A)

---

[1] Section 1112(b)(1) (emphasis added) provides:

> Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

("substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation"), exists for dismissal of the case.[2] In the alternative, Getty seeks relief from the automatic stay under 11 U.S.C. §362(d).

The court held an evidentiary hearing on October 14, 2009.[3] Getty called two (2) witnesses, Pauline Crispin (a Getty "manager") and Michael Stump (a Getty territorial "sales manager"). The Debtor called no witnesses.[4] After the hearing, the Debtor and Getty submitted

---

[2] In its Motion, Getty also asserted that "cause" for dismissal exists due to the Debtor's:

1. gross mismanagement of the estate, see 11 U.S.C. §1112(b)(4)(B);

2. failure to timely satisfy its reporting requirements, see id. §1112(b)(F);

3. failure to pay taxes owed after the petition date, see id.§1112(b)(4)(I);

4. bad faith in filing the petition, see, e.g., In re SGL Carbon Corp., 200 F.3d 154, 160-62 (3d Cir. 1999).

At the hearing on the Motion and in its post-hearing submissions, Getty devoted most of its attention to the issue of "cause" under §1112(b)(4)(A).

[3] The hearing was held forty-seven (47) days after Getty filed the Motion. 11 U.S.C. §362(e) provides that unless the court enters an order maintaining the stay in effect, the automatic stay against property of the estate terminates thirty (30) days after the filing of a motion seeking relief from the stay of acts against property of the estate. In this district, hearings on motions are "self-scheduled" by the parties based on dates obtained from the courtroom deputy. See L.B.R. 5070-1; 9014-3(c). For a motion subject to §362(e), this court' regular practice is to provide the movant with a hearing date within thirty (30) days of the filing of a motion. When Getty filed the Motion in this case on August 28, 2009, the hearing date provided by the court for motions for relief from stay was September 23, 2009 (twenty-four (24) days later). On August 28, 2009, the hearing date provided by the court for all other chapter 11 motions was October 14, 2009. Getty's attorney apparently self-scheduled the Motion for October 14, 2009.

[4] The Debtor's principal, Ram chandra Nallu, did not appear at the hearing. The Debtor's counsel advised the court that Mr. Nallu was out of the country, attempting to raise money for the Debtor's reorganization.

memoranda of law in support of their respective positions, the last of which was filed on October 20, 2009.

As set forth below, I conclude that: (1) Getty has established the existence of "cause" under §1112(b)(1); (2) this chapter 11 case should be converted to chapter 7; and (3) Getty is entitled to relief from the automatic stay under §362(d)(1).

## II.  FINDINGS OF FACT

1. On or about February 15, 2008, Getty and the Debtor entered into franchise and ancillary agreements for the Debtor's operation of a LUKOIL branded motor fuel service station located at 1685 Sumneytown Pike, Kulpsville, PA 19443 ("the Premises").

2. The agreements (hereinafter, collectively,"the PMPA Franchise Agreement") states that the parties established a franchise relationship "as defined by the Petroleum Marketing Practices Act, 15 U.S.C. Sections 2801, et seq." ("PMPA") (See Ex. Getty-1, at ¶1.1).[5]

---

[5]  Our Court of Appeals has described the PMPA as follows:

> The PMPA was enacted in 1978 in recognition of the "disparity of bargaining power between the franchisor and franchisee" in the gasoline industry. S. Rep. No. 731, 95th Cong., 2d Sess. 17, U.S. Code Cong. & Admin. News 1978, pp. 873, 877. The Act "establishes protection for franchisees from arbitrary or discriminatory termination or nonrenewal of their franchises," id. at 15, by imposing two requirements on franchisors. First, the franchisor may terminate a franchise only for certain statutorily prescribed grounds. 15 U.S.C. § 2802. Second, the franchisee must be given adequate notice of the franchisor's intent to terminate the franchise. Id. § 2804. The Act creates a private right of action for franchisees who have been subject to unlawful termination or nonrenewal of their franchise. Id. § 2805. In keeping with the Act's acknowledgment of the inferior economic and bargaining position of the franchisee, the franchisor who wishes to terminate or not renew a franchise has the burden of proving compliance with all the statutory requirements of the PMPA. Id. § 2805(c). Additionally, the Act allows franchisees to obtain a preliminary injunction upon a lesser showing than is usually required. Id. § 2805(b). The effect of the

3.  On or about February 15, 2008, Getty and the Debtor also entered into a Lessee Dealer Lease for the Premises ("the Lease"), requiring that the Debtor pay monthly rent of $5,400.00 from March 2008 through January 2011. (See Ex. Getty-2, at ¶2.2 & Initial Rent Schedule).[6]

4.  After entering into the PMPA Franchise Agreement and the Lease,[7] the Debtor occupied the Premises.

5.  The Debtor began business operations on the Premises on or about July 8, 2008.

6.  Since July 8, 2008, the Debtor's sole source of income has come from the operation of the gas station.[8]

7.  Until late March 2009, Getty supplied products (most notably, motor fuel) to the Debtor on the following credit terms: (a) invoice issued the day after delivery with (b) payment to be made by electronic fund transfer three (3) business days thereafter.

---

> PMPA thus is to create a presumption that any termination of a franchise is unlawful.

Sun Refining & Mktg. Co. v. Rago, 741 F.2d 670, 672 (3d Cir. 1984).

[6] In its preamble, the Lease states that it is "part of, and incorporated into, the PMPA Franchise Agreement". (Ex. Getty-2).

[7] Hereafter, as used in this Memorandum, the term "the PMPA Franchise Agreement" will be used to refer to the entire set of agreements between the parties, including the Lease. Nevertheless, when appropriate, I will make separate reference to the Lease.

[8] See Debtor's Statement of Financial Affairs (Docket Entry No. 31) ¶1. I may take judicial notice of the dockets of bankruptcy cases filed in this district and the content of the documents filed in such cases for the purpose of ascertaining the timing and status of events in the case and facts not reasonably in dispute. See Fed. R. Evid. 201; In re Scholl, 1998 WL 546607, at *1 n.1 (Bankr. E.D. Pa. Aug. 26, 1998).

8. In late March 2009, the Debtor's account with Getty had a past due, unpaid balance in excess of $47,000.00. As a result, Getty altered the credit terms for delivery of product, requiring the Debtor to prepay for deliveries of motor fuel.

9. On March 25, 2009, Michael Stump, the Getty sales manager assigned to the Debtor's territory, visited the Premises and observed signs on the gas pumps stating that the credit card machine was inoperable and limiting all sales of gasoline to cash transactions. He also observed that the Debtor's gas station was pricing its gasoline ten cents ($0.10) less than a nearby competitor gas station.

10. Later that day, Stump spoke to the Debtor's principal who promised that he would take steps to restore credit card operations at the station.

11. On March 26, 2009, Stump returned to the Premises and again observed signs on the pumps stating that the credit card machine was inoperable.

12. In the ordinary course of its operations prior to March 25, 2009, the Debtor's credit transaction revenues were deposited into a bank account that Getty could sweep to obtain payment of its invoices. Thus, the Debtor's unexplained shift to "cash only" transactions at the gas station at a time when the Debtor's account with Getty was substantially delinquent was perceived by Getty as disturbing. The confluence of the failure to accept credit transactions with the significant lowering of the price being charged for gasoline (compared to the nearest competitor) reasonably suggested to Getty that the Debtor may have been attempting to raise cash while avoiding its payment obligation to Getty.

13. On March 30, 2009, a Getty representative checked the level of the gas tanks located on the Premises and determined that the fuel level was below the minimum necessary for the

customer gas pump system to operate.[9]

14. Beginning at least as early as March 30, 2009, the Debtor failed to sell and distribute motor fuel ("the Failure to Operate") on the Premises.

15. On April 1, 2009, Getty sent the Debtor a letter stating that it had come to Getty's attention that the Debtor had permitted the Premises to run out of motor fuel. Getty demanded that the Debtor immediately purchase LUKOIL branded motor fuel and market the same to the public. Getty advised the Debtor a failure to purchase LUKOIL branded motor fuel and to sell the fuel to the public constituted a violation of the PMPA Franchise Agreement. The April 1st letter warned the Debtor that the failure to sell the fuel for seven (7) consecutive days would permit Getty to terminate the PMPA Franchise Agreement, the Lease and any ancillary agreements. (See Ex. Getty-3).

16. After April 1, 2009, the Debtor did not purchase LUKOIL branded motor fuel from Getty and did not resume selling motor fuel at the Premises.

17. The Failure to Operate continued for a period in excess of seven (7) days.

18. From March 30, 2009 to the present, the Debtor has not resumed selling and distributing motor fuel on the Premises.

19. On April 8, 2009, Getty gave the Debtor a written notice of termination of the Debtor's PMPA Franchise Agreement and the Lease ("the April 8th Termination Notice"), which was

---

[9] Mr. Stump testified credibly that when the fuel level in the storage tanks is below a certain level, it is mechanically impossible to operate the gas pumps.

based upon, <u>inter alia</u>, the Debtor's Failure to Operate.[10]

20. The April 8th Termination Notice provided for the termination of the PMPA Franchise Agreement and Lease (and any ancillary agreements) effective April 16, 2009 and directed the Debtor to vacate the Premises no later than May 8, 2009. (<u>See</u> Ex. Getty-4).

21. Thereafter, Getty commenced an eviction action against the Debtor and, on June 3, 2009, obtained a judgment for possession of the Premises and for rent in arrears in Magisterial District No. 38-1-28, Montgomery County, PA. (<u>See</u> Ex. Getty-5).

22. The Debtor appealed the judgment for possession to the Court of Common Pleas on June 22, 2009. (<u>See</u> Ex. Getty-6).

23. The Debtor filed this bankruptcy case on July 20, 2009, which stayed further proceedings in connection with the appeal of the judgment for possession of the Premises.

24. In the bankruptcy schedules it filed on August 14, 2009,[11] the Debtor disclosed that its only assets are:

      a. $5,000.00 in cash;

      b. a $60,000.00 security deposit held by Getty;

      c. equipment valued at $11,395.00;

      d. 600 gallons of gasoline valued at $1,573.00; and

      e. its asserted interest in the PMPA Franchise Agreement, with an "unknown"

---

[10] The April 8th Termination Notice listed three (3) other reasons for the termination of the PMPA Franchise Agreement and Lease, all of which are related to the failure to operate for seven (7) consecutive days. The other reasons give were: (1) not operating during the "operating hours required by the PMPA Franchise Agreement;" (2) failing to use "best efforts to maximize the sale of Products;" and (3) failing to "maintain an adequate inventory of motor fuel" to serve the needs of customers. (<u>See</u> Ex. Getty-4).

[11] (<u>See</u> Docket Entry Nos. 24-30, 35).

value.

(See Docket Entry No. 25).

24. In Schedule D, the Debtor listed one secured debt: a debt to Unity Bank for $537,681.71, $11,325.00 of which the Debtor listed as secured by an equipment lien. (See Docket Entry No. 27).

25. In Schedule F, the Debtor listed the following general unsecured debts:

    a. Unity Bank: $526,356.71 (the unsecured portion of the debt);[12]

    b. Getty: in an unknown amount;

    a. Atlantis Petroleum LLC: $120,000;

    b. PECO Energy: $2,762.77;

    c. Harold Levinson Assoc.: $14,040.61.

(See Docket Entry No. 29).

26. As of the commencement of the case, the Debtor's monetary default under the PMPA Franchise Agreement was approximately $63,000.00.

27. The Debtor has not maintained any hazard or liability insurance policies with respect to the Premises.[13]

---

[12] This appears to be the same debt as that the Debtor listed in Schedule D. I infer that the Debtor listed it again in Schedule F to reflect its undersecured status. See generally 11 U.S.C. §506(a) (permitting bifurcation of an undersecured claim into secured and unsecured component claims).

[13] As Getty has pointed out, the Debtor's schedules make no reference to any insurance contracts. In its written response to the Motion, the Debtor asserted that it provided evidence of insurance to U.S. Trustee. (Debtor's Answer ¶24, Docket Entry No. 45). At the hearing, however, the Debtor offered no evidence that any such insurance exists.

### III. DISCUSSION

#### A.

In their submissions to the court, the parties devoted most of their efforts to debating two (2) issues:

1. whether the April 8th Termination Notice complied with the PMPA and was effective to terminate the PMPA Franchise Agreement; and

2. if the termination notice was effective, whether, nevertheless, the Debtor retains a right to assume the PMPA Franchise Agreement under 11 U.S.C. §365(a).

#### 1.

Getty's argument may be summarized as follows:

- The PMPA Franchise Agreement between the Debtor and Getty is governed by the PMPA.

- The PMPA Franchise Agreement and Lease should be construed together to form an integrated business relationship subject to the PMPA.[14]

- The Debtor's Failure to Operate breached the PMPA Franchise Agreement and provided Getty with grounds to terminate the franchise relationship.[15]

- Under the PMPA, the Debtor's Failure to Operate for seven (7) consecutive days constituted valid grounds for Getty's termination of a franchise relationship. See 15 U.S.C. §2802(b)(2)(C);[16] id. §2802(c)(9).[17]

---

[14] See Dunkin' Donuts Inc. v. Liu, 79 Fed. Appx. 543, 546-47 (3d Cir. 2003) (nonprecedential); In re Harrison, 117 B.R. 570, 572-573 (Bankr. C.D. Cal. 1990).

[15] (See Ex. Getty-1, at ¶¶9.3, 14.1).

[16] Section 2802(b)(2)(C) provides that grounds for termination of a franchise relationship include: "[t]he occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise . . . relationship is reasonable." Id.

[17] Section 2802(c)(9) provides that the term "event," as used in §2802(b)(2)(C) includes "failure by a franchisee to operate the marketing premises for – (A) 7 consecutive days . . . ." Id.

(continued...)

- Under the PMPA, as a general rule, a franchisor is obliged to provide notification of the termination of the franchise not less than ninety (90) days before the effective date of the termination. See 15 U.S.C. §2804(a).

- However, in circumstances in which "it would not be reasonable" for a franchisor to provide ninety (90) days notice before the effective date of the termination, the franchisor may give less than than ninety (90) days notice before the effective date of the termination. In such cases, the franchisor must furnish notification of the termination "on the earliest date . . . reasonably practicable," i.e., the franchisor must give as much notice as is reasonably practicable. See id. §2804(b)(1)(A).[18]

- In the circumstances presented here, it would not have been reasonable for Getty to provide the Debtor with ninety (90) days notice before the effective date of the termination of the PMPA Franchise Agreement.[19]

- In the circumstances presented here, the eight (8) days notice Getty furnished constituted notification on the earliest date reasonably practicable.[20]

- Getty validly terminated the PMPA Franchise Agreement prior to the commencement of this bankruptcy case.

- Due to the prepetition termination of the PMPA Franchise Agreement, the PMPA Franchise Agreement was not part of the Debtor's bankruptcy estate under 11 U.S.C. §541 and the PMPA Franchise Agreement may not be assumed by the

---

[17](...continued)
§2802(b)(9).

[18]   The PMPA also requires that the termination notice be in writing, sent by certified mail or hand delivered, state an intention to terminate the franchise agreement, state the effective date of the termination and contain a statutorily-mandated disclosure. See 15 U.S.C. §2804(b)(1) and (c). The Debtor has not challenged the sufficiency of the April 8th Termination Notice under §2804(c).

[19]   As one court has observed, the statute provides no guidelines for determining whether less than ninety (90) days notice is appropriate, leaving the courts to determine the issue "on a case by case basis under the circumstances of each particular case." Marathon Petroleum Co. v. Pendleton, 689 F.Supp. 739, 744 (N.D. Ohio 1988), aff'd, 889 F.2d 1509 (6th Cir. 1989).

[20]   Some courts have held that less than ninety (90) days notice of termination may be given if, as here, the franchisee has defaulted monetarily and failed to operate for seven (7) consecutive days. See Equilon Enterprises, L.L.C. v. Rahim, Inc., 80 Fed. Appx. 463, 468 (6th Cir. 2003) (immediate termination); Dedvukaj v. Equilon Enterprises, L.L.C., 301 F. Supp.2d 664, 669-70 (E.D. Mich. 2004) (immediate termination), aff'd, 132 Fed. Appx. 582 (6th Cir. 2005); Charter Mktg. Co. v. Bergen, 1989 U.S. Dist. LEXIS 18393, at *10 (D. Conn. Oct. 20, 1989) (fifteen (15) days notice).

Debtor pursuant to 11 U.S.C. §365(a).[21]

- Any right the Debtor may have had under Pennsylvania law, as of the commencement of the bankruptcy case, to cure the default under the Lease does not vitiate the termination of the PMPA Franchise Agreement for purposes of 11 U.S.C. §§541 and 365.[22]

- Without the ability to assume the PMPA Franchise Agreement, the Debtor cannot successfully reorganize through this chapter 11 case.

**2.**

In response, the Debtor asserts that the April 8th Termination Notice was ineffective because it did not satisfy the requirements of the PMPA. The Debtor argues that the April 8th Termination Notice was inadequate because Getty did not give the Debtor ninety (90) days notice of the termination as provided in 15 U.S.C. §2804(a)(2). The Debtor suggests that there is "no evidence" that would justify a reduced notice period under §2804(b)(1). (See Debtor's Reply Brief, at 2) (Docket Entry No. 50).[23]

---

[21] See Matter of Triangle Lab., Inc., 663 F.2d 463, 467-68 (3d Cir. 1981) ("an executory contract or lease validly terminated prior to the institution of bankruptcy proceedings is not resurrected by the filing of the petition in bankruptcy, and cannot therefore be included among the debtor's assets"); see also In re Making the Dough, Inc., 2009 WL 975170, at *3 (Bankr. M.D. Pa. Mar. 27, 2009); In re Greenfield Dry Cleaning & Laundry, Inc., 249 B.R. 634, 641 (Bankr. E.D. Pa. 2000).

[22] Based on its premise that the April 8th Termination Notice was valid, Getty argues that if Pennsylvania law would permit the Debtor to reinstate the franchise relationship prior to its actual eviction from the Premises, it is preempted by the PMPA. See 15 U.S.C. §2806(a); In re Herbert, 806 F.2d 889, 894 (9th Cir. 1986); Moody v. Amoco Oil Co., 734 F.2d 1200, 1212 (7th Cir.), cert. denied, 469 U.S. 982 (1984).

[23] As with Getty, I state the Debtor's position without deciding its merits. I do observe that there was evidence that: (1) the Debtor was in breach of its payment obligations under the PMPA Franchise Agreement; (2) the Debtor failed to operate the business for more than seven (7) consecutive days; and (3) the materially lower price being charged for gasoline at the station by the Debtor combined with the Debtor's failure to sell any gasoline on credit for a period of time gave rise to a reasonable suspicion that the Debtor was attempting to operate the business on a cash basis to Getty's detriment. The question is whether these circumstances made it unreasonable to expect Getty to adhere to the

(continued...)

The Debtor also argues that even if Getty's April 8th Termination Notice validly terminated the PMPA Franchise Agreement, the Debtor nonetheless retained the right to assume the franchise agreement under 11 U.S.C. §365(a) . Specifically, the Debtor argues that "because of the inextricable nature of the franchise agreement and lease, no termination occurred under Pennsylvania State property law because actual repossession of the premises did not occur." (Debtor's Reply Brief, at 1) (Docket Entry No. 50).[24]

### 3.

After careful deliberation, I conclude that it is unnecessary to resolve the issues arising under the PMPA. I will assume <u>arguendo</u> that the Debtor would prevail on these issues, that the

---

[23](...continued) statutory ninety (90) days notice period in terminating the PMPA Franchise Agreement and, if so, whether the eight (8) days notice given was adequate.

There are decisions that lend support to the Debtor's argument. See <u>Pruitt v. New England Petroleum Ltd. P'ship</u>, 2006 WL 3332773, at *4 (D. Conn. Nov. 16, 2006) (ninety (90) days notice required for noncompliance with "minimum hours" and "minimum gasoline purchase" requirements of PMPA franchise agreement); <u>B.A. Constr. & Mgmt., Inc. v. Knight Enter., Inc.</u>, 2006 WL 932307, at *8 (E.D. Mich. Apr. 11, 2006) (ninety (90) days notice required for noncompliance with "minimum gasoline purchase" requirements of PMPA franchise agreement); <u>Zipper v. Sun Co., Inc.</u>, 947 F. Supp. 62, 68-69 (E.D.N.Y. 1996) (ninety (90) days notice required for monetary default in absence of realistic fear that substantial delinquencies would result during the notice period); see generally <u>Wisser Co. v. Mobil Oil Corp.</u>, 730 F.2d 54, 60 (2d Cir. 1984) (the ninety (90) day requirement "should not be lightly excused").

If the Debtor's argument on this issue were to prevail, it would follow that the PMPA Franchise Agreement is an executory contract that is assumable under 11 U.S.C. §365(a). If the PMPA Franchise Agreement is assumable by the Debtor, the potential for a successful reorganization would be enhanced. This would not necessarily provide the Debtor with a complete defense to Getty's Motion. But it would negate Getty's argument that a successful reorganization is impossible because assumption of the franchise agreement is precluded as a matter of law.

[24] The Debtor relies upon <u>In re Karfakis</u>, 162 B.R. 719, 727 (Bankr. E.D. Pa. 1993), where the court stated, "Under Pennsylvania law, a [real property] lease is not terminated when the tenant fails to pay rent until the tenant is physically evicted." See also <u>In re Turner</u>, 326 B.R. 563, 572-73 (Bankr. W.D. Pa. 2005); <u>In re Borbidge</u>, 66 B.R. 998, 1003 n.11 (Bankr. E.D. Pa. 1986).

-12-

PMPA Franchise Agreement was not irrevocably terminated prepetition and that it is subject to assumption under the Bankruptcy Code. Nonetheless, I conclude that Getty is entitled to relief under 11 U.S.C. §1112(b) and §362(d)(1).

**B**.

Section 1112(b)(1) of the Bankruptcy Code provides that the court "shall" convert or dismiss a chapter 11 case, whichever is in the best interests of creditors, if a movant establishes "cause." See 11 U.S.C. §1112(1). Section 1112(b)(4) identifies sixteen (16) examples of "cause" for purposes of §1112(b)(1). The examples of cause in §1112(b)(4) are "illustrative and not exhaustive." In re Corinthian, LLC, 2009 WL 363165, at *4 (Bankr. E.D. Pa. Feb. 11, 2009); see also In re South Canaan Cellular Inv., Inc., 2009 WL 2922959, at *5 (Bankr. E.D. Pa. May 19, 2009); In re Johnson, 2008 WL 696917, at *6 (Bankr. E.D. Pa. Mar. 11, 2008).

Section 1112(b) utilizes a burden-shifting approach. As our district court recently explained:

> Under section 1112(b)(1), the initial burden lies with the movant to establish "cause" for conversion. If the movant establishes "cause", the burden shifts to the debtor to prove it falls within the Section 1112(b)(2) exception for "unusual circumstances." The exception only applies if: "(1) the debtor or a party in interest objects and establishes that there is a reasonable likelihood that a plan will be confirmed within the time frames set forth in [S]ections 1121(e) and 1129(e), or if these provisions are inapplicable, within a reasonable period of time; (2) the grounds for granting such relief include an act or omission of the debtor for which there exists a reasonable justification for such act or omission; and (3) such act or omission will be cured within a reasonable period of time."

DCNC N. Carolina I, L.L.C. v. Wachovia Bank, N.A., 2009 WL 3209728, at *4 (E.D. Pa. Oct. 5, 2009) (internal citation omitted); accord In re Gateway Access Solutions, Inc., 374 B.R. 556, 561

(Bankr. M.D. Pa. 2007).[25]

Here, I find that Getty met its initial burden of establishing cause in two ways.

First, Getty has established that the Debtor has failed "to maintain appropriate insurance that poses a risk to the estate or to the public." 11 U.S.C. §1112(b)(4)(C); see Finding of Fact No. 27.

Second, even if the PMPA Franchise Agreement is assumable, the record reflects an "absence of a reasonable likelihood of reorganization." 11 U.S.C. §1112(b)(1), (b)(4)(A).[26]

It is obvious that the PMPA Franchise Agreement is the Debtor's most valuable asset and that a successful reorganization in this case would require that the Debtor assume the agreement. If the Debtor were to attempt to assume the PMPA Franchise Agreement, the Debtor would be obliged to:

> (1) cure or provide adequate assurance of a prompt cure of the prepetition monetary default to Getty;
>
> (2) compensate or provide adequate assurance that it would compensate Getty for Getty's actual pecuniary losses as a result of the Debtor's default under the PMPA Franchise Agreement; and
>
> (3) provide adequate assurance of future performance under the franchise agreement.

See 11 U.S.C. §365(b).

As of the commencement of the bankruptcy case, the Debtor's prepetition default under

---

[25] Recently, I opined that §1112(b) may be ambiguous with respect to the initial burden of proof, at least when the asserted "cause" for dismissal or conversion is the Debtor's alleged inability to confirm a chapter 11 plan. See In re DCNC North Carolina I, LLC, 407 B.R. 651, 660 n.23 (Bankr. E.D. Pa. 2009). As discussed below, even if Getty bore the initial burden, I find that Getty met the burden.

[26] Although the statute refers to a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," 11 U.S.C. §1112(b)(4)(A) (emphasis added), courts have held that the inability to propose a feasible reorganization or liquidation plan, by itself, provides "cause" for dismissal or conversion of a chapter 11 case on request of an interested party. E.g., DCNC North Carolina I, L.L.C., 2009 WL 3209728, at *5; In re 3 RAM, Inc., 343 B.R. 113, 117-18 & n.14 (Bankr. E.D. Pa. 2006).

the PMPA Franchise Agreement and Lease was in excess of $60,000.00.[27] Almost three (3) months passed between the filing of the bankruptcy case and the hearing on the Motion, during which time the Debtor's default on its monetary obligations to Getty has increased (although the current amount of the monetary default was not quantified at the hearing on the Motion). Also, the Debtor's schedules disclosed a substantial amount of other debt, in excess of $500,000.00, almost entirely unsecured. The unsecured debt, as well, would have to be addressed in a plan of reorganization.

In this case, a successful reorganization would necessitate some infusion of funds, either from business operations or outside sources. The Debtor, however, is not operating its business and, as of the hearing date on the Motion, had not done so for more than six (6) months. At the hearing, other than cross-examine Getty's witnesses, from an evidentiary perspective, the Debtor did nothing more than argue that, as a matter of law, the PMPA Franchise Agreement was not terminated irrevocably prepetition.[28] In particular, the Debtor present no evidence that it has

---

[27] Getty's witness, Ms. Cripsin, acknowledged that the Debtor provided Getty with a $60,000.00 security deposit and that the approximately $63,000.00 indebtedness is subject to a credit after application of the security deposit. I note, however, that §2.4(a), (b) of the PMPA Franchise Agreement and §2.7 of the Lease both provide that if Getty uses the security deposit to satisfy any outstanding indebtedness, the Debtor is obliged to "replace" the security. (See Ex. Getty-1 and Ex.Getty-2). Thus, to the extent that, in filing this chapter 11 case the Debtor's goal is reorganize and maintain the franchise relationship with Getty, it must be able to pay Getty approximately $63,000.00, not just $3,000.00.

[28] In its response to the Motion, the Debtor alleged that, before it ceased operating and at Getty's suggestion, it "turned over control of its business" to another Getty franchisee "who absconded with the Debtor's revenues," suggesting that Getty has not properly acknowledged "its role in facilitating the theft." (Debtor's Answer to Motion ¶10) (Docket Entry No. 45). However, at the hearing, the Debtor introduced no evidence in support of this asserted defense. I also note that while there is some reference to this alleged theft of the Debtor's assets in the Debtor's Statement of Financial Affairs (Docket Entry No. 30, at ¶3.b.), there is no reference to this claim in Schedule B. (See Docket Entry No. 25).

taken any concrete steps to obtain financing to fund its reorganization.[29]  In short, the Debtor did not present even a general outline of reorganization strategy and offered no evidence in support of the feasibility of any reorganization plan that it may be contemplating.

On this record, made almost three (3) months after the commencement of a chapter 11 reorganization, Getty met its initial burden under §1112(b)(1) by showing the extent of the Debtor's monetary default under the franchise agreement and the absence of any business operations by the Debtor for a substantial period of time. This shifted the burden to the Debtor to provide some evidence of its ability to reorganize and the Debtor did not meet its burden.

In reaching these conclusions, I am cognizant of the principle that, in evaluating the merits of a §1112(b) motion at a relatively early stage in the case, bankruptcy courts are not stringent in assessing the feasibility of the debtor's proposed reorganization plan. See, e.g., In re Minnesota Alpha Found., 122 B.R. 89, 91 (Bankr. D. Minn. 1990).  At the same time, however, when the movant's evidence raises a bona fide question whether there is a reasonable likelihood of a successful reorganization, the debtor must make some record to support the conclusion that the proposed reorganization has some plausibility and is not a "mere financial pipe dream." See generally In re 6200 Ridge, Inc., 69 B.R. 837, 843 (Bankr. E.D. Pa. 1987) (referring to debtor's obligation to make some showing that a reorganization is possible in defending against a motion under 11 U.S.C. §362(d)(2) (quoting In re Jug End in the Berkshires, Inc., 46 B.R. 892, 902 (Bankr. D. Mass. 1985) and In re Dublin Properties, 12 B.R. 77, 81 (Bankr. E.D. Pa. 1981)). Early in the case, the debtor's burden may not be great, but there is nonetheless some burden to

---

[29]  In its written response to the Motion, the Debtor stated that its principal was "in the process of liquidating $150,000.00 of personal assets, to be "injected into the bankruptcy estate" and was negotiating with counsel for certain "insiders" who allegedly absconded with the Debtor's funds to obtain repayment of the money.  (Debtor's Answer to Motion ¶30).  However, the Debtor offered no evidence at the hearing in support of these allegations.

be met after the movant has met its initial burden under 11 U.S.C. §1112(b).

Here, the Debtor has not satisfied even the most minimal burden of demonstrating that that it has a reasonable likelihood of achieving a rehabilitation through the chapter 11 process. The Debtor presently lacks the assets necessary for a reorganization and has presented no evidence that it has taken any action that might put it in the position to provide for its creditors. "[W]hen a Chapter 11 debtor has no intention or ability to reorganize or perform its own liquidation or otherwise fulfill pertinent bankruptcy obligations . . . a debtor [should] not be permitted to remain in bankruptcy simply in order to enjoy the protections of the automatic stay." In re Mazzocone, 183 B.R. 402, 412 (Bankr. E.D. Pa. 1995), aff'd, 200 B.R. 568 (E.D. Pa. 1996); see also Alan N. Resnick & Henry J. Sommer, eds., 7 Collier on Bankruptcy ¶1112.04[2], at 1112-23 (15th rev. ed. 2009) (hereinafter, "Collier") ("In order avoid the costs of chapter 11 in cases in which they are not justified, section 1112(b) was designed to provide the court with a powerful tool to weed out inappropriate chapter11 cases at the earliest possible stage").

For these reasons, I find that Getty has established "cause" for dismissal or conversion of the case.

## C.

Once cause exists under §1112 for conversion or dismissal of a case, the decision whether to convert or dismiss is entrusted to the discretion of the bankruptcy court. In re Congoleum Corp., 414 B.R. 44, 61 (D.N.J. Aug. 17, 2009); In re Camden Ordnance Mfg. Co. of Arkansas, Inc., 245 B.R. 794, 797 (E.D. Pa. 2000); In re Brown, 2005 WL 2589194, at *2 (Bankr. E.D. Pa. Mar. 31, 2005). In deciding whether to convert or dismiss a case, the court may consider a variety of factors, including:

1. whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal;

2. whether there would be a loss of rights granted in the case if it were dismissed rather than converted;

3. whether the debtor would simply file a further case upon dismissal;

4. the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors;

5. in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise;

6. whether any remaining issues would be better resolved outside the bankruptcy forum;

7. whether the estate consists of a "single asset";

8. whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests;

9. whether a plan has been confirmed and whether any property remains in the estate to be administered;

10. whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns; and

11. consideration of the effect of dismissal under 11 U.S.C. §349.

7 Collier ¶1112.04[6], at 1112-57 to 1112-59.

In exercising my judgment regarding the proper disposition in this case, I find the nature of the Debtor's assets and debts to be the most significant factor. It appears that the Debtor has little in the way of cash or tangible personal property and that its debts are primarily unsecured. However, in its filings with the court, the Debtor has suggested that it was victimized by another Getty franchisee that "absconded" with the Debtor's funds. See nn.28-29, supra.

In light of the Debtor's allegations, I find it advisable to convert the case to chapter 7 so that an independent fiduciary may be appointed by the U.S. Trustee to investigate the claim

described by the Debtor and, in his or her business judgment, determine whether it is worth pursuing. If there is merit to the claim, the trustee may be able to raise an estate sufficient to generate a meaningful distribution to creditors.

**D.**

Having determined that this chapter 11 case should be converted to chapter 7, the last question is whether Getty should be granted relief from the automatic stay, pursuant to 11 U.S.C. §362(d). In the Motion, Getty asserts that it is entitled to relief to resume prosecution of the prepetition state court eviction proceedings with respect to the Premises.[30] I agree.

Section 362(d)(1) provides that upon request of a party in interest and after notice and a hearing, the court shall grant relief from the stay "for cause, including the lack of adequate protection of an interest in property of such party in interest." In considering Getty's request, I will assume again, arguendo, that Getty did not terminate irrevocably the PMPA Franchise Agreement and the Lease before the commencement of the bankruptcy case.[31]

The interrelationship of 11 U.S.C. §365 (relating to the assumption and rejection of executory contracts and unexpired leases) and 11 U.S.C. §362(d) (relating to relief from the automatic stay) has generated considerable judicial discussion. See, e.g., In re El Paso Refinery, L.P., 220 B.R. 37, 42-45 (Bankr. W.D. Tex. 1998); In re Reice, 88 B.R. 676, 681-84 (Bankr. E.D. Pa. 1988); In re Grant Broadcasting of Philadelphia, Inc., 71 B.R. 891, 900-01 (Bankr. E.D.

---

[30] Getty did not request any relief under §362(d) with respect to the $60,000.00 security deposit.

[31] If the Debtor's rights under the Lease are viewed in isolation and without reference to the PMPA Agreement and Getty's federal preemption arguments, the Debtor's argument that the Lease was not irrevocably termination prepetition due to the Debtor's continued possession of the appears consistent with Pennsylvania law. See n.24, supra.

-19-

Pa. 1987); In re Borbidge, 66 B.R. at 1000-02; In re Sweetwater, 40 B.R. 733, 742-44 (Bankr. D. Utah 1984), aff'd, 57 B.R. 743 (D. Utah 1985).

To resolve the issue before me, I need not wade into this intellectual debate. Based on the analysis set forth in Part III.B, supra, I conclude that even if the Lease is assumable, the Debtor has not made the minimal showing necessary that it has the financial wherewithal to assume the lease under 11 U.S.C. §365(a), (b). That finding, combined with the Debtor's ongoing post-petition default of its obligations under the Lease, see 11 U.S.C. §362(d)(3), constitute "cause" under §362(d)(1) to grant Getty relief to pursue its in rem remedies under applicable state law to recover possession of the Premises. See In re Turner, 326 B.R. at 577.

### IV. CONCLUSION

For the reasons set forth above, the Motion will be granted. An Order consistent with this Memorandum will be entered.[32]

**Date:   November 9, 2009**

ERIC L. FRANK
U.S. BANKRUPTCY JUDGE

---

[32]    11 U.S.C. §1112(b)(3) provides that the court shall decide a motion to dismiss a chapter 11 case within fifteen (15) days after commencement of the hearing on the motion, unless the movant consents or "compelling circumstances" prevent the court from meeting that time deadline. In this case, Getty did not expressly waive the time deadline. The delay in this case was caused by the press of other judicial business and my view that the consequences to the parties of my ruling and the nature of the legal issues merited a comprehensive explanation of the reasons for the decision. This made it impossible to satisfy the fifteen (15) day deadline. Some courts have found similar circumstances to constitute "compelling circumstances." See In re 210 W. Liberty Holdings, LLC, 2009 WL 1522047, at *1 n.2 (Bankr. N.D. W. Va. May 29, 2009); In re Jayo, 2006 WL 2433451, at *5 n.18 (Bankr. D. Idaho July 28, 2006). See generally In re Pinnacle Lab., Inc., 2008 WL 5157981, at *4 n.1 (Bankr. D. N.M. June 19, 2008) (court observes that there is no apparent consequence for the failure to meet the deadline, but "apologizes" for missing the deadline).